UNITED STATES BANKRUPTCY COURT                  **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                             :
                                                   :            Chapter 11
        DREIER LLP,                                :            Case No. 08-15051 (SMB)
                                                   :
                                Debtor.            :
------------------------------------------------------------X
SHEILA M. GOWAN, Chapter 11 Trustee of the         :
Estate of DREIER LLP,                              :
                                                   :
                                Plaintiff,         :
                                                   :
        -- against --                              :            Adv. Proc. No. 10-5458 (SMB)
                                                   :
WACHOVIA BANK, N.A., and WELLS                     :
FARGO BANK, N.A., in its Capacity as               :
Successor-By-Merger to WACHOVIA BANK,              :
N.A.,                                              :
                                                   :
                                Defendants.        :
------------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## GRANTING MOTION TO DISMISS THE
## COMPLAINT WITH LEAVE TO REPLEAD

**A P P E A R A N C E S :**

REED SMITH LLP
Attorneys for Defendants Wachovia Bank, N.A.
  and Wells Fargo Bank, N.A.
599 Lexington Avenue
New York, New York 10022

        Jordan W. Siev, Esq.
        Melissa Rubenstein, Esq.
        Han J. Ahn, Esq.
        Nicole O'Sullivan, Esq.
                Of Counsel

DIAMOND MCCARTHY LLP
Attorneys for Plaintiff Sheila M. Gowan,
  Chapter 11 Trustee of the Estate of Dreier LLP
620 Eighth Avenue, 39th Floor
New York, New York 10018

>        Howard D. Ressler, Esq.
>        Stephen T. Loden, Esq.
>        Laura Manion, Esq.
>              Of Counsel.

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Over the course of three years, Wachovia Bank, N.A. ("Wachovia") made various loans or extended credit to the debtor, Dreier LLP, in exchange for security interests in Dreier LLP's property. Sheila M. Gowan, the chapter 11 trustee of the estate of Dreier LLP (the "Trustee"), filed this adversary proceeding to avoid those liens and recover all sums paid by Dreier LLP to Wachovia. Wachovia moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Trustee withdrew most of her claims at or subsequent to oral argument, and this opinion focuses on the few that remain. For the reasons that follow, Wachovia's motion is granted, and the Trustee's request for leave to replead is also granted to the limited extent discussed below.

## BACKGROUND[1]

On December 7, 2008, Marc S. Dreier ("Marc")[2] was arrested for operating a massive Ponzi scheme. (¶ 13.) Prior to his arrest, Marc was the sole equity partner in Dreier LLP, a New York City law firm employing over 100 attorneys. (¶¶ 13, 17.) Marc F. Pomerantz was

---

[1]    The "Background" discussion is derived from the Complaint, filed Dec. 15, 2010 (the "Complaint") (ECF Doc. # 1). The parenthetical notation "(¶ _)" refers to paragraphs in the Complaint. Unless otherwise noted, all ECF Doc. #s refer to this adversary proceeding.

[2]    At times, the Complaint refers to Marc as MSD and Dreier LLP as DLLP. At other times, it refers to "Dreier," an undefined term, without distinguishing between Dreier LLP and Marc. This opinion makes the distinction, where appropriate, based on the context.

appointed by the United States District Court as receiver for Dreier LLP (the "Receiver"), and filed this chapter 11 proceeding on December 16, 2008. (¶¶ 14–15.) The Trustee was appointed as the chapter 11 trustee on December 30, 2008. (¶ 16.)

Wachovia is a national banking association with its principal places of business in Charlotte, North Carolina and Boston, Massachusetts. (¶ 9.) Wells Fargo Bank, N.A. ("WF", and collectively with Wachovia, the "Defendants") is a national banking association with its principal place of business in Sioux Falls, South Dakota. (¶ 10.) On March 30, 2010, WF purchased all of the assets and liabilities of Wachovia, and the Defendants merged. (¶ 12.)

At some point before 2005, Marc began his Ponzi scheme, defrauding clients and third parties by selling fictitious "promissory notes." (¶ 17.) A classic Ponzi scheme, Marc repaid earlier investors as well as defrauded Dreier LLP clients with the funds stolen from later investors and clients. (¶ 17.) Marc's scheme required enough cash to pay his investors, operate Dreier LLP and fund his own lavish lifestyle. The defrauded investor and client funds were deposited into and transferred from Dreier LLP's attorney escrow account (the "5966 Account") maintained at J.P. Morgan Chase Bank ("Chase"). (*See* ¶¶ 18, 37.)

A.    **Wachovia's Pre-October 2007 Transactions with Dreier LLP**

Prior to October 2007, when Wachovia allegedly became suspicious of Marc's illegal activities, Dreier LLP and Wachovia engaged in four lending or credit transactions. The Trustee has withdrawn her claims relating to these transactions, and I recount them only briefly.

1.    **The October 2005 Letter of Credit**

On October 7, 2005, Wachovia issued a letter of credit in the amount of $10 million to support Dreier LLP's lease of the space at 499 Park Avenue. (¶ 21.) Ten days later, Dreier LLP

3

executed a letter of credit security agreement with Wachovia, granting Wachovia a security interest in all Dreier LLP's deposit accounts at Wachovia, including a money market account containing $10 million in Dreier LLP funds (the "LC Security Agreement").  (¶ 21.)

### 2.    The December 2005 Revolving Line of Credit

On December 1, 2005, the parties executed a $5 million revolving credit agreement (the "Revolving Line of Credit") and a security agreement granting Wachovia a security interest in all Dreier LLP accounts and general intangibles consisting solely of its unbilled time and disbursements  (the "Security Agreement").  (¶ 22.)  The Revolving Line of Credit also permitted Dreier LLP to request additional letters of credit up to $1 million.  (¶ 22.)

### 3.    The October 2006 Amended Letter of Credit Security Agreement

On October 30, 2006, Dreier LLP and Wachovia amended the LC Security Agreement to allow Dreier LLP to request additional letters of credit up to $2.5 million.  The parties reaffirmed and extended the LC Security Agreement to grant Wachovia additional liens in Dreier LLP's property.  (¶ 23.)  Shortly thereafter, Wachovia issued two letters of credit, aggregating $1,489,855, to secure two Dreier LLP-affiliate leases in California.  Both letters of credit were secured by additional deposits of like amounts into a Dreier LLP money market account at Wachovia.  (¶ 24.)

### 4.    The January 2007 Amended Revolving Line of Credit

On January 18, 2007, Wachovia and Dreier LLP executed an Amended and Restated Credit Agreement that refinanced the then-existing $3.5 million balance on the Revolving Letter of Credit and extended the lending cap by $2 million, raising the total borrowing limit to $5.5

million (the "First Amended Revolving Line of Credit").  (¶¶ 26, 27.)   Dreier LLP and

Wachovia also reaffirmed and extended the Security Agreement to grant Wachovia additional

liens over Dreier LLP's property (the "First Amended Security Agreement").  (¶ 27.)

These transactions made Dreier LLP a significant profit center for Wachovia.[3]  In August

2006, Nathan Hale, the primary Wachovia employee responsible for the bank's relationship with

Dreier LLP, reported that Wachovia had earned $134,525 in fees and expenses from its business

with Dreier LLP during the seven month period since January 1, 2006, and that Dreier LLP

would contribute $270,000 to Wachovia's profits by the end of 2006.  As a result of the

additional letters of credit issued to secure the two California leases, Wachovia revised its

estimate upwards, predicting that Dreier LLP would contribute over $300,000 in revenue to

Wachovia in 2006, $400,000 in 2007, and further revenue growth in subsequent years as Dreier

LLP continued its projected expansion.  (¶ 25.)  Shortly after the January 2007 First Amended

Revolving Line of Credit transaction, Hale reported that Dreier LLP was now Wachovia's most

profitable client, and predicted that the relationship might grow in 2007 to $500,000.  (¶ 27.)

**B.      The October 2007 Yacht Loan and the "Inklings"**

In October 2007, Marc purchased a luxury yacht (the "Yacht") for approximately $17

million funded from Dreier LLP accounts at Wachovia.  (¶ 28.)  Soon thereafter, Marc asked

Wachovia to grant an $8 million personal loan secured by a mortgage on the Yacht (the "Yacht

Loan").  (¶ 28.)  Marc's request was referred to Christina Tighe, a Credit Risk Officer at

---

[3]      The Complaint often speaks of the profitable "Dreier" relationship, but the bulk of the transactions
described in the Complaint involved loans to Dreier LLP.  Furthermore, Marc was not paying his personal loans in a
timely manner.

Wachovia.  (¶ 29.)  Tighe had no prior involvement with Marc or Dreier LLP, and her compensation was not related to fees Wachovia earned through their business.  (¶ 29.)

After reviewing Marc's financial statements, Tighe notified Hale and other Wachovia employees that Marc's income did not support the Yacht Loan.  Specifically, she was unable to verify that any cash had been paid to Marc in 2004 or 2005; his personal tax returns reflected no salary or wages and his K-1s reflected no guaranteed payments or cash distributions.  (¶ 30.)  Tighe offered to speak to Marc's accountants to obtain more information.  When others at Wachovia rejected her offer, she went on record stating that Marc had "materially misrepresented his assets on his personal financial statement by representing business assets as personal assets."  (¶ 30.)

Hale reported to Robert Tolan, Wachovia's Senior Vice President and Regional Banking Manager, that Tighe was accusing Marc of fraud.  (¶ 30.)  After Tighe had suggested she speak with Marc's accountants, Hale expressed his frustration in an email to Jeffrey Grossman, Wachovia's Senior Vice President and National Managing Director, stating that her request could "put our most profitable relationship at risk."  (¶ 32.)  Grossman suggested, in response, that Tolan would work with Hale to get back on track.  (¶ 32.)

Hale's colleagues in the Legal Specialty Group also voiced concerns about Marc's finances.  (¶ 33.)  Grossman and Fernando Calvo, Senior Banking Advisor in the group, met with Marc to discuss his finances as part of their consideration of the Yacht Loan.  Like Tighe, Calvo recognized that it was critical that Wachovia understand the source of Marc's wealth based on his recent "large ticket" purchases.  (¶ 33.)

6

After the meeting, Calvo performed an analysis of the financial statements for Dreier LLP and Marc. He concluded that Dreier LLP's operations and Marc's purchases consumed $60 million. While the firm generated a substantial amount of cash, it consumed most of that cash through operations, and there was no explanation for the "dramatic increase in cash assets." (¶ 34.) Concurring with Calvo and Tighe, Grossman observed, "We don't understand his cash flow. It doesn't add up." (¶ 34.)

Rather than demanding that Marc explain his income, Hale was concerned that further pressure would be perceived as an affront to Marc's integrity, and would cause him to take his lucrative business elsewhere. (¶ 35.) Wachovia ultimately extended the $8 million Yacht Loan, even though the questions raised by Tighe, Calvo, and Grossman were not answered. (¶ 36.)

### C.    Dreier LLP's Escrow Accounts

By mid-2008, Dreier LLP had moved virtually all of Dreier LLP's banking to Wachovia, except for the one Dreier LLP account that could generate large profits for Wachovia; the 5966 Account remained at Chase. (¶ 37.) Hale attempted to induce Marc to move the Dreier LLP escrow account by accommodating his various requests without regard to bank procedures, and possibly, sound banking. With Hale's support, Wachovia provided a $100,000 Visa card to Marc only 24 hours after he asked for it, (¶ 38), waived its internal rules regarding the production of financial information and helped set up the Dreier LLP offices to accept credit cards, (¶ 39), and allowed Dreier LLP to overdraw its operating account by up to $360,000. (¶ 40–41.) Hale recommended approving this request because "Marc pledged to move the remainder of his business to Wachovia immediately after this [overdraft] is approved." (¶ 40.) A few days later, Dreier LLP moved Dreier LLP's Stamford office accounts to Wachovia and deposited an

additional $18 million into a certain Dreier LLP money market account at Wachovia.  (¶ 41.)

Dreier LLP nevertheless kept the 5996 Account at Chase.  (¶ 41.)

### D.  The October 2008 Loan

On October 6, 2008, Dreier LLP asked Wachovia to increase the Revolving Line of

Credit by an additional $9 million—bringing the borrowing limit to $16 million—a direct

response to increasing liquidity demands created by the Ponzi scheme.  (¶ 42.)  Conscious of

Wachovia's desire to obtain the escrow account, Marc promised to move the escrow account to

Wachovia when the loan was approved.  (¶ 43.)  Hale told his colleagues that the loan should

"add $35 million to $40 million in incremental average balances to the relationship."  (¶ 43.)

Hale so wanted the escrow account that he overlooked the fact that Marc was late on interest and

principal payments on the Yacht Loan.  (¶ 43.)

With Hale's urging, Wachovia approved the $9 million loan (the "October 2008 Loan")

nine days later on October 17, 2008.  Later that same day, the parties executed the Second

Amended and Restated Credit Agreement (the "Second Amended Revolving Line of Credit"),

and as part of the agreement, Dreier LLP and Wachovia reaffirmed and extended an earlier

security agreement to grant Wachovia additional liens over Dreier LLP property (the "Second

Amended Security Agreement").  (¶ 44.)  Although the Complaint is not entirely clear, it appears

that the security interest was not actually granted or perfected until the following Monday,

leaving the debt unsecured for three days.  Thus, David Bigley, Wachovia's Regional CFA for

Wealth Management Finance, cautioned that Wachovia was extending an "unsecured and

uncompensated line of credit for the 3 days this will be outstanding over the weekend."  (¶ 45.)

Bigley warned Hale that "we really should avoid these situations as much as possible."  (¶ 45.)

After the loan closed, Hale wrote to Dreier LLP's chief financial officer, "Time to send in the escrow deposits!!!!!!" (¶ 46.)

As soon as the loan closed, Marc instructed Wachovia to deposit $8,256,250 from the new line of credit into the 5966 Account. (¶ 47.) Once that occurred, Marc wired substantially all of the money to a Ponzi scheme investor as repayment of principal, interest, and fees on that investor's investment. (¶ 47.)

Despite Marc's promises, he never moved the 5966 Account to Wachovia. (¶ 48.) On October 29, 2008, Hale was notified by Wachovia's internal monitoring systems that Marc was late on both his apartment payments and the Yacht Loan. (¶ 48.) Hale instructed his team not to call Marc because he was a very valuable client. (¶ 48.) The Wachovia mortgage department complied with that instruction, and placed a note in Marc's file that he should not be contacted about the late payments. (¶ 48.) Wachovia had earned $469,468 in 2008 from its relationship with Marc and Dreier LLP. (¶ 48.)

### E.     The Aftermath

At the time of Marc's arrest, Wachovia had a large credit exposure to Dreier LLP but still held security interests in all of Dreier LLP's cash and accounts receivable pursuant to the various agreements described above. (¶ 49.) After the Receiver was appointed, but prior to the commencement of this case, Wachovia initially refused to allow the Receiver to use any cash in Dreier LLP accounts unless Wachovia was granted additional security interests in Dreier LLP property. (¶ 50.) Lacking the ability to run the receivership without funds, the Receiver agreed to Wachovia's demands. (¶ 50.) On December 15, 2008, the Receiver executed an agreement

granting Wachovia a security interest in all of Dreier LLP's personal property, up to the amount

of cash collateral used by the Receiver (the "December 2008 Security Agreement").  (¶ 50.)

Following the petition date, Dreier LLP's various landlords declared lease defaults and

drew on the letters of credit issued by Wachovia to secure the lease obligations.  The bank

reimbursed itself in the total amount of $16,127,575.19, apparently with the Court's approval,

from the Dreier LLP money market account that secured the letters of credit (the "LC

Payments").  (¶ 51.)  In addition, by December 9, 2010, the Trustee had paid Wachovia

$3,901,057.33 pursuant to a cash collateral order entered by the Court that specifically reserved

the Trustee's right to seek avoidance of Wachovia's asserted liens and disgorgement of the post-

petition payments.  (¶ 52.)

## F.    The Complaint and Motion to Dismiss

The Trustee filed the 26-count Complaint on December 15, 2010, alleging, in the main,

that the various obligations and related liens described above were constructively fraudulent,

intentionally fraudulent, and/or preferential.  The Trustee also demanded turnover and equitable

subordination of the Defendants' claim and objected to Wachovia's proof of claim under 11

U.S.C. § 502(d).  At oral argument, the Trustee agreed to dismiss without prejudice Counts I

through XIV (concerning the pre-October 2007 transactions).  Similarly, she agreed to dismiss

without prejudice Count XXII, involving a preference claim arising from Wachovia's transaction

with the Receiver, and Count XXIII (the turnover claim) except to the extent that it related to

amounts paid to Wachovia in connection with the October 2008 Loan.  She thereafter agreed to

dismiss Count XXIII in its entirety as well as Count XXIV, again without prejudice.  (*Trustee's*

*Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss the*

*Complaint,* dated July 6, 2011 ("*Trustee's Supp. Memo*"), at 2, 4  (ECF Doc. # 21).)

10

The majority of the remaining claims—Counts XV through XX—focus on the October 2008 Loan and the Second Amended Security Agreement (collectively, the "October 2008 Transfers"), and invoke bankruptcy and New York state actual and constructive fraudulent transfer laws.  In addition, Count XXI alleges that the October 2008 Transfers were preferences, Count XXV asserts an equitable subordination claim, and Count XXVI seeks disallowance of Wachovia's claim under 11 U.S.C. § 502(d).

The Defendants moved to dismiss on various grounds, but most of their arguments have been mooted by the Trustee's withdrawal of the aforementioned claims.  As noted, the claims that remain relate to the October 2008 Transfers.  At bottom, the Defendants contend that the Complaint alleges a series of unexceptionable banking transactions in which Wachovia sought to earn fees but ultimately lost a lot of money.  Furthermore, Wachovia did not invest in the Ponzi scheme and did not maintain the account through which Marc ran it.  The Trustee counters that Wachovia knew or should have known that Marc would cause Dreier LLP to fraudulently transfer the October 2008 Loan proceeds as part of the Ponzi scheme.

**DISCUSSION**

A.      **Standards Governing the Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  *Iqbal* outlined a two-step approach in deciding a motion to dismiss.  *Fowler v. U.P.M.C. Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("The Supreme Court's opinion in *Iqbal* extends the reach of *Twombly* [to civil cases] . . . [and offers] a two-part analysis.").  First, the court should begin by "identifying pleadings that, because they are no more than [legal]

conclusions, are not entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1950. Threadbare

recitals of the elements of a cause of action supported by conclusory statements are not factual.

*See id.* at 1949. Second, the court should give all "well-pleaded factual allegations" an

assumption of veracity and determine whether, together, they plausibly give rise to an

entitlement of relief. *Id.* at 1950. Plausibility requires more than a "sheer possibility" of

wrongdoing—the plaintiff must plead sufficient factual content to allow the court "to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

Determining whether a claim is plausible is "a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense." *Id.* at 1950.

In deciding the motion, "courts must consider the complaint in its entirety, as well as

other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

particular, documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007),

in addition to statements in "legally required public disclosure documents filed with the SEC,

and documents possessed by or known to the plaintiff and upon which it relied in bringing the

suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *accord Roth v.

Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–

53 (2d Cir. 2002); *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000). The Defendants'

opposition attached several documents, but the parties disagree over whether they can be

considered in connection with the Defendants' motion. I have not considered these documents in

deciding the motion.

B.    **Collapsing the October 2008 Transactions**

Standing alone, the October 2008 Transfers did not harm Dreier LLP or its creditors.

Dreier LLP incurred a $9 million obligation and granted an additional $9 million security interest

in its assets, but in return, received $9 million in cash.  Instead, the damage, if any, to the

creditors occurred when Dreier LLP allegedly transferred virtually the entire loan proceeds to a

Ponzi scheme investor; if Dreier LLP had retained the $9 million or discharged its own

obligation with the proceeds, the creditors would not have been injured.  *HBE Leasing Corp. v.*

*Frank*, 48 F.3d 623, 635 (2d Cir. 1995); *see Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d

240, 249 (2d Cir. 1987) (bank loan used to repay valid insider debt did not diminish the debtor's

assets and the bank loan was not made or repaid in bad faith).  Thus, to avoid the ostensibly

legitimate October 2008 Loan and related security interest, and recover any payments, the

Trustee must collapse the first transfer (Dreier LLP's loan and related lien) with the second

(Dreier LLP's transfer of the proceeds to the Ponzi scheme investor).  (*See Trustee's*

*Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint*, dated Apr.

21, 2011 ("*Trustee's Opposition*"), at 12–14 (ECF Doc. # 14).)[4]

Under appropriate circumstances, multiple transactions will be collapsed and treated as

steps in a single transaction for analysis under the fraudulent conveyance laws.  *HBE Leasing*

*Corp.*, 48 F.3d at 635; *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("[A]n allegedly

fraudulent conveyance must be evaluated in context; [w]here a transfer is only a step in a general

plan, the plan must be viewed as a whole with all its composite implications.") (internal

quotation marks and citations omitted).  A party seeking to collapse a series of transactions must

---

[4]        The Defendants point out that the transaction involved an intermediate, third transfer from Wachovia to the
5966 Account at Chase.  Although the transfer to the escrow account may give rise to a discrete fraudulent transfer
discussed below, it does not affect the relief granted in this opinion.

satisfy two elements, or prongs.  First, "the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors."  *HBE Leasing*, 48 F.3d at 635.  Second, the initial transferee "must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent."  *Id.*; *accord In re Best Prods. Co., Inc.*, 168 B.R. 35, 56–57 (Bankr. S.D.N.Y. 1994) (courts frequently examine the defendant's knowledge "of the structure of the entire transaction and . . . whether its components were part of a single scheme") (internal quotation marks and citation omitted); *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002) ("Courts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction.").

Actual knowledge has been found to exist where the "initial transferor was intimately involved in the formulation or implementation of the plan by which the proceeds of the loan were channeled to the third-party."  *Sunbeam*, 284 B.R. at 370; *accord United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 n.8 (3d Cir. 1986) (lender in an LBO participated in meetings and "was intimately involved with the formulation of the agreement whereby the proceeds of its loan were funnelled [sic] into the hands of the purchasers of the stock of a corporation that was near insolvency"); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 502–03 (N.D. Ill. 1988) (lenders had actual knowledge where they were well aware of each other's loans, knew that the buyer intended to use the proceeds to purchase the debtor's shares, received the same information concerning the fraudulent conveyance laws as the board of directors and

14

agreed with the buyer and the board to structure the LBO so as to avoid the fraudulent

conveyance laws); *see Lippi v. City Bank*, 955 F.2d 599, 610 (9th Cir. 1992) (lender knew that

proceeds of its loan would be used to make fraudulent transfer and played a role in structuring

the transaction).  Constructive knowledge, on the other hand, will be found where the initial

transferee became aware of circumstances that should have led it to inquire further into the

circumstances of the transaction, but failed to make the inquiry.  *HBE Leasing*, 48 F.3d at 636.

A court must focus on the interdependence of the multiple transactions and whether the

participants knew or should have known that no transaction would occur unless all of the other

transactions occurred.  *See Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d

206, 212 (3d Cir. 1990) (collapsing transactions where each part of the transaction was

dependent on the occurrence of the other and the defendant would not have consented to one of

the transactions if the other would not occur); *Official Comm. of Unsecured Creditors v. Clark

(In re Nat'l Forge Co.)*, 344 B.R. 340, 348 (W.D. Pa. 2006) ("Among other things, courts

consider whether all of the defendants were aware of the multiple steps of the transaction [and]

whether each step would have occurred on its own or, alternatively, whether each step depended

upon the occurrence of the additional steps in order to fulfill the parties' intent."); *Hechinger Inv.

Co. of Delaware v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537,

546–47 (D. Del. 2005) (collapsing transaction where the defendants knew about the multiple

steps of the transaction, each step of the transaction would not have occurred on its own and each

step relied on additional steps to fulfill the parties' intent); *Sher v. SAF Fin., Inc.*, Civ. Action

No. RDB 10-1895, 2010 WL 4034272, at *7 (D. Md. Oct. 14, 2010) (same); *MFS/Sun Life

Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995)

15

(collapsing LBO where no single transfer would have taken place without the expectation that the entire transaction would be consummated, and the parties were aware of the overall LBO).

### 1.    The First Prong

The First Prong of the collapsing analysis focuses on the transfer that did the damage. Here, the Trustee alleges that Dreier LLP retransferred the October 2008 Loan proceeds to a Ponzi scheme investor, and these transfers were both actually and constructively fraudulent. As explained immediately below, the allegations in the Complaint, or at least those charging actual fraud and constructive fraud under the Bankruptcy Code, satisfy the First Prong.

Count XV asserts an intentional fraudulent transfer under 11 U.S.C. § 548(a)(1)(A).[5]  The Complaint alleges that Marc instructed Wachovia to deposit $8,256,250 of loan proceeds into the 5966 Account at Chase, and Marc "immediately wired substantially all of the proceeds to an investor in the Note Fraud as repayment of principal, interest, and fees on that investor's investment in the Note Fraud."  (¶ 47.)  "Courts have uniformly recognized a presumption of actual intent to defraud on the part of the transferor in the context of a Ponzi scheme.  Known as the Ponzi scheme presumption, an actual intent to defraud is presumed because the transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Gowan v. Patriot Group, LLC (In re Dreier LLP)*, Adv. Proc. No. 10-3524 (MG), 2011 WL 2412581, at *24 (Bankr. S.D.N.Y. June 16, 2011) ("*Patriot*") (internal quotation marks and citations omitted).  Marc's knowledge and intent are imputed to Dreier LLP as Marc was the sole equity partner.  Accordingly, the Complaint sufficiently alleges that Dreier

---

[5]      Section 548(a)(1)(A) allows a trustee to avoid a transfer made or an obligation incurred by the debtor where the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."

LLP transferred the proceeds to the Ponzi scheme investor with actual intent to defraud its creditors within the meaning of Bankruptcy Code § 548(a)(1)(A).[6]

Count XVII makes a similar claim under New York law[7] through Bankruptcy Code § 544(b)(1).  The same Ponzi scheme presumption applies to the New York claim.  *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*, 440 B.R. 243, 257 (Bankr. S.D.N.Y. 2010). The Defendants nevertheless argue that under New York law, the plaintiff must also allege the fraudulent intent of the transferee, and the Complaint fails to do so.  (*Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint*, dated Feb. 22, 2011 ("*Defendants' Memo*"), at 21 (ECF Doc. # 7) (citing *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 243 (Bankr. S.D.N.Y. 2000)).)  The decisions on this question are admittedly inconsistent, prompting Bankruptcy Judge Glenn to review the issue at length in *Patriot*, 2011 WL 2412581, at *28–33. He concluded, and I agree for the reasons he stated, that the plaintiff is only required to plead the

---

[6]    The Complaint also alleges that Wachovia received the October 2008 Transfers without good faith and with knowledge of the voidability of the October 2008 Transfers. (¶ 156.)  The transferee's "good faith" is an affirmative defense under Bankruptcy Code § 548(c) which the trustee is not required to plead.  *Patriot*, 2011 WL 2412581, at *26.  Hence, the Court will not consider "good faith" on Defendants' motion to dismiss in connection with the First Prong of the Trustee's bankruptcy fraudulent transfer claim.

The transferee's good faith and lack of knowledge of the voidability of the transfer or obligation is also an affirmative defense under 11 U.S.C. § 550(b).  *Cassirer v. Sterling Nat'l Bank & Trust Co. (In re Schick)*, 223 B.R. 661, 663–65 (Bankr. S.D.N.Y. 1998).  The defense is only available to transferees of the initial transferee.  Since Wachovia was an initial transferee of the security interest that the Trustee is seeking to avoid, the defense is not available.

[7]    N.Y. DEBT. & CRED. LAW § 276 ("DCL") states:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Section 544(b)(1) of the Bankruptcy Code provides, in relevant part, that the Trustee may "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

fraudulent intent of the transferor under DCL § 276. *Id.* at *33. Accordingly, the Trustee has adequately pleaded that Dreier LLP transferred the October 2008 Loan proceeds with actual fraudulent intent under New York law.

The Complaint also asserts several claims under the bankruptcy and New York constructive fraudulent transfer laws. While constructive fraudulent transfer claims have several elements, the Defendants raise only two points in their motion. First, they argue that Dreier LLP received "reasonably equivalent value" and "fair consideration" in exchange for the $9 million lien that the Trustee is seeking to avoid. (*Defendants' Memo* at 15–17.) Second, Wachovia maintains that it acquired the debt and lien in good faith. (*Defendants' Memo* at 18–20.)

Count XVI alleges a constructive fraudulent transfer under Bankruptcy Code § 548(a)(1)(B).[8] According to the Complaint, Dreier LLP transferred an interest in property and/or incurred an obligation, (¶ 159), received less than reasonably equivalent value, (¶ 161), and was (1) already insolvent or was rendered insolvent by the October 2008 Transfers, (¶ 162), (2) engaged in a business or transaction, or about to do so, for which it had unreasonably small capital, (¶ 163), and (3) Dreier LLP intended to incur or believed it would incur debts beyond its ability to pay as those debts matured. (¶ 164.) Count XVI also alleges that Wachovia received the obligations without good faith and with knowledge of their avoidability. (¶ 165.)

---

[8]    Section 548(a)(1)(B) provides, in relevant part, that the trustee can avoid an obligation or transfer where the debtor:

> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or] (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured .

For the reasons discussed in an earlier footnote, good faith is an affirmative defense under § 548(c) that the Trustee is not required to plead in connection with the First Prong of her *bankruptcy* fraudulent transfer claim, and the affirmative defense of good faith and lack of knowledge of voidability under Bankruptcy Code § 550(b) does not apply to Wachovia.  As the Defendants have not challenged the sufficiency of the allegations regarding the financial tests under Bankruptcy Code § 548(a)(1)(B)(ii), their only remaining argument centers on reasonably equivalent value.

In a nutshell, the Defendants argue that the lien granted as part of the October 2008 Transfers was given to secure a valid debt, and is, therefore, not avoidable as a constructive fraudulent transfer.  *See Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 732 (Bankr. S.D.N.Y. 2008).  The argument assumes that the underlying $9 million debt is valid.  Here, the Trustee also challenges the validity of the $9 million obligation.  If the obligation is avoided as fraudulent, the lien is unsupported by consideration.

The Defendants' argument also illustrates the importance of the collapsing doctrine to the Trustee's claims.  From the Defendants' standpoint, Wachovia loaned $9 million to Dreier LLP in exchange for the $9 million debt and lien.  If, however, Dreier LLP immediately transferred the proceeds to a third party as part of an integrated transaction, and Dreier LLP did not discharge its own debt through that transfer, it would not have received any consideration.  The Complaint, in this regard, alleges that Dreier LLP immediately transferred the October 2008 Loan proceeds to a Ponzi scheme investor.  The Defendants have not contended that this transfer

satisfied a debt owed by Dreier LLP.[9]   Accordingly, Count XVI states a claim that Dreier LLP

incurred a constructively fraudulent obligation and made a constructively fraudulent transfer

under § 548(a)(1)(B) in connection with the First Prong of the collapsing doctrine.

Counts XVIII, XIX and XX, allege constructive fraudulent conveyance claims,

respectively, under DCL §§ 273, 274 and 275.[10]   Each fraudulent conveyance claim requires the

Trustee to plead lack of "fair consideration."[11]   Unlike "reasonably equivalent value" under the

Bankruptcy Code § 548(a)(1)(B)(i), "fair consideration" also requires that the transferee acquire

the obligation or receive the conveyance in "good faith."   Consideration of Wachovia's "good

---

[9]      It is possible that Dreier LLP's transfer of the loan proceeds to a Ponzi scheme investor satisfied a restitution obligation or rescission claim held by the investor against Dreier LLP to the extent the investor was a "net loser" in the Ponzi scheme.  *See Patriot*, 2011 WL 2412581, at *34, 41.  Neither side has raised this issue, and the Court does not reach it.

[10]     DCL § 273 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

DCL § 274 provides:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

DCL § 275 provides:

> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

[11]     Under DCL § 272:

> Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

faith" provides a convenient segue into a discussion of the Second Prong of the collapsing test—whether Wachovia knew or should have known of Marc's scheme to use the loan proceeds to pay off a Ponzi scheme investor.

### 2.    The Second Prong

The "knowledge" requirement under the Second Prong reflects the policy of the Uniform Fraudulent Conveyance Act to protect innocent purchasers for value who received the debtor's property without awareness of any fraudulent scheme, *HBE Leasing*, 48 F.3d at 636, and is closely connected to the requirement of "good faith." *See id.* ("UFCA requirement of 'good faith' refers solely to 'whether the grantee knew, or should have known, that he was not trading normally, but that . . . the purpose of the trade, so far as the debtor was concerned, was the defrauding of his creditors.'" (quoting 1 GARRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES § 295, at 512 (1940)); *Patriot*, 2011 WL 2412581, at *42 (same).  The "good faith" inquiry is an objective one that generally asks whether the transferee had information that put it on inquiry notice that the transferor was insolvent, or that the transfer might be made with a "fraudulent purpose," and whether a diligent inquiry would have discovered the fraudulent purpose of the transfer.  *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 310–11 (S.D.N.Y. 2010) (discussing 11 U.S.C. § 548(c)) (collecting cases).

The Trustee generally relies on the same allegations to support her assertion that Wachovia had actual and constructive knowledge of Marc's fraudulent scheme and received the October 2008 Transfer in bad faith.  (*Compare Trustee's Opposition* at 13–14 (discussing actual and constructive knowledge) *with id.* at 16 (discussing good faith).)  According to the Trustee, Wachovia knew or had reason to believe that (1) Dreier LLP's and Marc's aggregate cash flow

was insufficient to cover the $60 million required to support the law firm's operations and

Marc's luxury purchases; (2) Marc had used Dreier LLP funds to purchase a yacht in his own

name; (3) Marc had substantial IRS tax liability problems; (4) Marc was late on payments for his

yacht and apartment loans; and (5) Marc had made misrepresentations on his financial

statements.  (*See Trustee's Opposition* at 13–14, 16.)  At oral argument, the Trustee also

contended that Wachovia knew or should have known that the loan proceeds were being

transferred to an escrow account at Chase.  (Transcript of hearing held June 2, 2011, at 24–26

(ECF Doc. #18).)

While Wachovia may have had reason to question Marc's honesty and the accounting for

and source of all of the funds used by him and Dreier LLP, this does not add up to actual or

constructive knowledge that (1) Marc was running a Ponzi scheme through Dreier LLP's account

at Chase, or (2) the October 2008 Loan proceeds were destined for a Ponzi scheme investor.

Wachovia did not invest in the Ponzi scheme; it loaned money to Dreier LLP, a seemingly

legitimate enterprise which, unlike Marc, apparently paid its obligations on time.  The Complaint

refers to only one overdraft, and does not attribute any late payments or defaults to Dreier LLP.

Further, Marc did not run his fraudulent scheme through Wachovia.  Thus, the inflow and

outflow of funds connected with the Ponzi scheme transactions would not have come to

Wachovia's attention or sounded any alarms.

The Trustee's theory is also implausible.  At bottom, she maintains that Wachovia had

actual or constructive knowledge that Marc was running a Ponzi scheme through the Chase 5966

Account, and yet insisted that he transfer the account so he could run his Ponzi scheme through

Wachovia.  Although Wachovia was anxious to earn more fees from Dreier LLP's business, it is

difficult to believe that Wachovia would *knowingly* choose to facilitate Marc's fraudulent

scheme as the way to earn those fees.  At most, the Complaint alleges that Wachovia's desire for
profits clouded its assessment of Dreier LLP as a credit risk.  In the final analysis, Wachovia
may have been guilty of bad banking, but the Complaint fails to allege that it had actual or
constructive knowledge of Marc's fraudulent scheme.

This conclusion does not necessarily end the Court's inquiry.  The Trustee alluded to a
second possible fraudulent transfer theory at oral argument (the "Escrow Transfer Theory").  The
Complaint alleges that at Marc's direction, Wachovia deposited $8,256,250 from the October
2008 Loan proceeds into 5966 Account at Chase.  (¶ 47.)  If the 5966 Account was a true escrow
account, the deposit might constitute a fraudulent transfer of Dreier LLP's equitable interest in
the loan proceeds.  This theory does not depend on Wachovia's knowledge of a Ponzi scheme,
although it still depends on collapsing the two transfers.

The Trustee argued, in this regard, that Wachovia knew that Dreier LLP was transferring
the loan proceeds into an escrow account at Chase.  Wachovia correctly contends that the
Complaint fails to allege this *in haec verba*, but it fairly implies it.  First, by mid-2008, Marc
"had shifted virtually all of DLLP's banking relationships to Wachovia, except one DLLP
account which could generate large profits for Wachovia – the 5966 Account – remained at JP
Morgan."  (¶ 37.)  Wachovia pressed Marc to transfer the escrow account, with balances between
$10 million and $40 million, to Wachovia.  (¶¶ 40, 43, 46.)  These allegations support the
inference that Wachovia knew or should have known by October 2008 that the only account left
at Chase was the escrow account.  Second, the title of that 5966 Account was "Dreier LLP
Escrow Account."  *Patriot*, 2001 WL 2412581, at *1.  Wachovia presumably learned the title

when it effected the deposit, and hence, that the money was being transferred into a non-operating account which, in equity, did not belong to Dreier LLP.[12]

This does not suggest that the Trustee could successfully plead or prove such a claim. For example, despite its name, the 5966 Account may not have been an escrow account. According to the Complaint, Marc used the 5966 Account to receive and pay out the funds derived from the Ponzi scheme, to maintain his life style and run Dreier LLP.  (¶¶ 18, 36.)  If the 5966 Account was just another Dreier LLP account, the deposit into that account would not have involved a transfer to a third party.  In addition, the Complaint alleges that the October 2008 Loan was needed to repay investors and to "replace client escrow funds that he had looted from the 5966 Account."  (¶ 42.)  If the transfer to Chase satisfied a pre-existing obligation to restore the stolen client funds, it would not be constructively fraudulent.  Given the failure to articulate the Escrow Transfer Theory in the Complaint and the indirect manner in which the Trustee raised it, the Court will dismiss the fraudulent transfer claims with leave to replead the Escrow Transfer Theory.

## C    The Preference Claim (Count XXI)

Count XXI asserts that the lien granted in connection with the October 2008 Transfers was a preference because it was given or perfected three days after the loan was disbursed. Wachovia does not contend that the Complaint fails to plead the elements of a preference under 11 U.S.C. § 547(b).  Instead, it argues that the face of the Complaint shows that the transfer of the security interest was made substantially contemporaneously with the loan, and hence, pleads

---

[12]    The Trustee made this point in further support of her argument that Wachovia knew or should have known that Marc was running a Ponzi scheme.  For the reasons stated in the preceding text, Wachovia's knowledge that Dreier LLP was transferring operating funds to an escrow account does not add up to actual or constructive knowledge that Marc was running a Ponzi scheme, or that the transfer was part of it.

all of the elements of a defense under 11 U.S.C. § 547(c)(1). *See Official Comm. of the*

*Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir.

2003) ("[A] complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6)

motion raising an affirmative defense 'if the defense appears on the face of the complaint.'"

(quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir. 1998))).  I agree.

Section 547(c)(1) of the Bankruptcy Code provides:

> The trustee may not avoid under this section a transfer . . . to the extent that such transfer was—
>
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>
> (B) in fact a substantially contemporaneous exchange.

Section 547(c)(1) imposes three requirements on the exchange: (1) the transferee

delivered new value, (2) the parties intended the exchange to be contemporaneous, and (3) the

exchange was, in fact, substantially contemporaneous.  Under Bankruptcy Code § 547(a)(2)

> "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

Wachovia provided "new value" by disbursing $9 million to Dreier LLP on October 17,

2008, in exchange for a secured obligation.  The Trustee argues that there was no "new value"

because the loan proceeds were immediately paid out to investors in the Ponzi scheme.  This,

however, conflates the fraudulent transfer and preference analyses, arguing that the Court should

collapse the transactions for preference purposes as well.  The definition of "new value" does not

hinge on what the debtor does with the funds, the Trustee has not cited any support for the

argument that it does, and the Court is not aware of any.  Dreier LLP was unquestionably the

25

transferee of the loan proceeds, having acquired dominion and control over them (Marc directed Wachovia to transfer the funds to Chase), and the October 2008 Loan meets the definition of "new value."

The Complaint also alleges that the parties intended that the exchange be contemporaneous.  Wachovia approved the $9 million loan to Dreier LLP on October 17, 2008, and later that same day, Dreier LLP and Wachovia executed the Second Amended Revolving Line of Credit.  The $9 million loan and the Second Amended Revolving Line of Credit were part and parcel of the same transaction.  (*See* ¶ 45 ("Wachovia approved the $9 million Second Amended Revolving Line of Credit in only eleven days.").)  The Complaint further alleges that "[a]s part of the Second Amended Revolving Line of Credit," Wachovia was granted "additional liens" over Dreier LLP's property.  (¶ 44).  In short, the parties intended the grant of additional security to be part of the same transaction as the $9 million loan, and entered into the loan and security agreement on the same day as part of that transaction.

Finally, the Complaint alleges that the exchange was, in fact, substantially contemporaneous.  The requirement of substantial contemporaneity was intended to codify the result in *Dean v. Davis*, 242 U.S. 438 (1917) (Brandeis, J.).  5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 547.04[1][b], 547-48 (16th ed. 2011).  There, the debtor (Jones) had discounted notes bearing forged endorsements.  The bank insisted that Jones "take up" the notes.  Jones borrowed $1,600 from his brother-in-law (Dean) to "take up" the notes, promising to secure Dean's loan with a mortgage.  The mortgage was not executed until *seven* days after the loan was disbursed, and was recorded the following day.  Following bankruptcy, the trustee (Davis) sought to set aside the mortgage as a preference and a fraudulent transfer.

26

The Court concluded that there was no preference because "[t]he mortgage was given to secure Dean for a substantially contemporary advance."  242 U.S. at 443.

While substantial contemporaneity must be decided on a case-by-case basis, the exchange in this case could not be more substantially contemporaneous unless it was simultaneous. According to the Complaint, the loan was disbursed on Friday, October 17, 2008, and remained unsecured for three days.  (¶¶ 44–45.)  The next business day, Monday, October 20, 2008, Dreier LLP granted the additional lien or Wachovia perfected it, or both; the Complaint is not entirely clear.  Assuming that the law in these circumstances would disregard the fraction of a day, one business day is as *substantially* contemporaneous as it gets, and is certainly more substantially contemporaneous than the seven day delay in *Dean v. Davis*.  Accordingly, the allegations of the Complaint support all of the elements of a defense under § 547(c)(1), and the preference claim is dismissed.

### D.    Equitable Subordination (Count XXV)

Relying on the same conduct that supported her fraudulent transfer claims, the Trustee maintains that Wachovia's claim in this bankruptcy case should be equitably subordinated under Bankruptcy Code § 510(b).  Wachovia is a non-insider of Dreier LLP.  "Although equitable subordination can apply to an ordinary creditor, the circumstances are 'few and far between.'" *Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977, 1006 (9th Cir. 2006); *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners, L.P.)*, 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997).  The proponent must plead and prove that the non-insider engaged in "gross and egregious" conduct "tantamount to fraud, misrepresentation, overreaching or spoliation."  *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 838–39 (Bankr. S.D.N.Y. 1994); *accord Official Comm. of Unsecured*

*Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC)*, 420 B.R. 112, 156

(Bankr. S.D.N.Y. 2009); *Sunbeam Corp.*, 284 B.R. at 364; *see Vargas Realty Enters., Inc. v.*

*CFA W. 111 St., L.L.C. (In re Vargas Realty Enters., Inc.)*, 440 B.R. 224, 240–41 (S.D.N.Y.

2010).

The allegations that support a collapsing claim under the fraudulent transfer laws do not

necessarily also support an equitable subordination claim against a non-insider.  *See First*

*Alliance Mortgage Co.*, 471 F.3d at 1007 ("No authority supports the Trustee's claim that

independently tortious conduct is 'egregious' as a matter of law.").  For example, constructive

fraudulent transfers rarely if ever involve gross and egregious conduct.  Even when a complaint

alleges gross and egregious conduct, equitable subordination is only an alternative to a monetary

recovery for the creditor's wrongdoing, and the trustee cannot recover damages and equitably

subordinate a claim based on the same wrong.  *Hirsch v. Pennsylvania Textile Corp. (In re*

*Centennial Textiles, Inc.*), 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998); *Granite Partners*, 210

B.R. at 517.

Here, the Trustee has withdrawn or the Court has dismissed all of the substantive claims,

and it follows that the allegations do not support equitable subordination.  The Trustee argues

that the equitable subordination claim can survive even if all of her other claims are dismissed,

(*see Trustee's Supp. Memo* at 5), but fails to explain how.  If Dreier LLP did not transfer the

October 2008 Loan proceeds with actual fraudulent intent or Wachovia did not know or have

reason to believe that the proceeds would be re-transferred fraudulently, the Trustee will be hard-

pressed to show that Wachovia was guilty of "gross and egregious" conduct.  Accordingly, the

Court dismisses Count XXV with leave to replead to the extent that the Trustee has also been

granted leave to replead the Escrow Transfer Theory.

The Trustee should nevertheless wish to consider whether it is worth the "ink." Equitable subordination merely reorders the priority of the claim, but the claim may still be allowed. If the Trustee pleads and ultimately proves that Wachovia received a fraudulent transfer, Wachovia's claim will be disallowed under Bankruptcy Code § 502(d). Thus, the § 502(d) claim provides broader relief than the Trustee's equitable subordination claim. Furthermore, Wachovia will not be entitled to any distribution unless it returns the fraudulent transfer. In that event, the estate will have been made whole, and will not be entitled to the additional remedy of equitable subordination.

**E.       Section 502(d) (Count XXVI)**

Section 502(d) provides:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

The Trustee must plead a legally sufficient avoidance claim to plead a legally sufficient disallowance claim under § 502(d). The Trustee has withdrawn or the Court has dismissed all of the avoidance claims, and accordingly, the § 502(d) disallowance fails. The Trustee is granted leave to replead this claim to the same extent that she is granted leave to replead the Escrow Transfer Theory.

**F.       Leave to Replead**

The Trustee seeks leave to replead any claims dismissed by the Court, but except for the Escrow Transfer Theory, the dismissal of the various claims is with prejudice. Generally, leave to amend should be freely granted when justice so requires unless it would be futile. *Acito v.*

*Imcera Group, Inc.*, 47 F.3d 47, 55 (2d. Cir. 1995); *see Lucente v. Int'l Bus. Machs. Corp.*, 310

F.3d 243, 258 (2d Cir. 2002) ("Where it appears that granting leave to amend is unlikely to be

productive, however, it is not an abuse of discretion to deny leave to amend." (quoting *Ruffolo v.*

*Oppenheimer Co.*, 987 F.2d 129, 131 (2d Cir. 1993))).   The Court may also take into account

that through Rule 2004, the plaintiff has had ample opportunity to investigate its claims, and has

still fallen short.   *See Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169,

194–95 (Bankr. S.D.N.Y. 2010); *O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Group*

*Ltd.)*, 383 B.R. 231, 282–83 (Bankr. S.D.N.Y. 2008).   The decision is committed to the trial

court's discretion. *Ruffolo,* 987 F.2d at 131.

        The Trustee had two years to prepare her Complaint, aided by Rule 2004 discovery.   This

is not a case where she was unable to identify and sufficiently plead the underlying fraudulent

transfer of the loan proceeds to a Ponzi scheme investor.   The problem with her pleading relates

to Wachovia's awareness of Marc's scheme.   The Court has found these allegations wanting

because of Wachovia's lack of contact with the scheme either as an investor or as a bank and the

implausibility of its supposed desire to acquire the account so it could knowingly facilitate the

scheme and earn more fees.   The Trustee has not indicated that she could plead any other facts

bearing on Wachovia's actual or constructive awareness that Marc ran a Ponzi scheme, or that he

planned to use the October 2008 Loan to fund it.   As a result, leave to replead these claims would

not be productive.   In addition, the preference claim is plainly barred by the contemporaneous

exchange for value defense, and no point would be served by granting the Trustee leave to replead it.

The parties are directed to settle an order consistent with this opinion.

So ordered.

Dated: New York, New York
       August 3, 2011

                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge